| | | |
|---|---|---|
| S.J. REEVES and H. O'MALLEY, individually and on behalf of all others similarly situated, | ) ) ) | Case No. 1:22-cv-3533 |
| Plaintiffs, | ) ) | Class Action Complaint |
| v. | ) ) | Jury Trial Demanded |
| 7-ELEVEN, INC., a Texas corporation, | ) ) | |
| Defendant. | ) | |

**CLASS ACTION COMPLAINT**

Plaintiff, S. J. Reeves and H. O'Malley ("Plaintiffs") by and through their undersigned counsel, pursuant to all applicable Federal Rules of Civil Procedure, hereby file this class action complaint on behalf of themselves and all others similarly situated throughout the United States, and alleges against Defendant, 7-Eleven, Inc., as follows:

**I.    INTRODUCTION**

1.      Founded in 1927, 7-Eleven, Inc. ("7-Eleven") is an American company that operates an international chain of convenience stores with approximately 71,100 stores in 17 countries. In addition to snacks, gas and miscellaneous retail items, 7-Eleven markets, advertises, distributes, and sells various types of tobacco products, including but not limited to cigarettes.

2.      At issue here are 7-Eleven's marketing and sale of Newport and Kool menthol cigarettes (the "Products"). See Exhibit 1, consisting of photographs taken on November 7, 2022 of 7-Eleven's advertising and marketing of the Product at locations in Texas. The photographs attached as Exhibit 1 are a true and correct representation of the Products' marketing and advertisement throughout 7-Eleven stores across the country.

3.      Defendant represents the Products as mere ordinary cigarettes, when in fact, they

are not because menthol cigarettes are far more dangerous and addictive than any other type of cigarette available to consumers. Defendant fails to disclose material information concerning the fact that the Products pose additional health risks far beyond those seen with nonmenthol cigarettes.

4.     Tobacco products with menthol can be more addictive and harder to quit because they can enhance the effects of nicotine. Published modeling studies have estimated that 324,000 to 654,000 smoking attributable deaths would be avoided by the year 2060 if menthol cigarettes were no longer available in the United States[1].

5.     Menthol remains a primary reason for youth cigarette smoking initiation, smokers' addiction, and continued smoking. Menthol flavor in cigarettes disguises their harsh taste, making it attractive for beginners to experiment with cigarettes and ultimately become addicted. The availability of menthol cigarettes frustrates smoking cessation and contributes to tobacco-related health disparities. Even though cigarette sales overall have declined in recent years, sales of menthol cigarettes continue to climb in the United States.

6.     Despite the wealth of scientific research elucidating the inordinate hazards of menthol cigarettes, Defendant fails to disclose material information concerning the Products' disproportionately toxic effects. As a result, Plaintiffs purchased Products that are unreasonably harmful and addictive and not as warranted and represented by Defendant.

7.     As of 2018, menthol cigarettes account for 36% of all cigarette sales—the highest proportion since major tobacco companies were required to report domestic market share of menthol and non-menthol cigarettes.

8.     Defendant's marketing and advertising of the Products is false and deceptive.

---

[1] See https://www.federalregister.gov/d/2022-08994/p-57

Through a variety of advertising methods, including but not limited to the packaging, product placement and marketing of the Products, Defendant has made false representations regarding the true nature of the Products.

9.      Plaintiffs and consumers expected to purchase conventional cigarettes only to learn that they were in fact purchasing a product far more addictive and harmful than any of the other cigarettes available on the market; as a result, Plaintiffs and consumers were denied the benefit of their bargain.

10.     Defendant's false and misleading representations and omissions violate state and federal law, including Washington D.C.'s Deceptive and Unfair Trade Practices Act, as detailed more fully below.

## II.     JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter presented by this Complaint because it is a class action arising under 28 U.S.C. § 1332(d), which, under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), explicitly provides for the original jurisdiction of the Federal Courts of any class action in which any member of the Plaintiff class is a citizen of a state different from any Defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000, exclusive of interest and costs.

12.     On information and belief, Plaintiffs allege that the total claims of individual class members in this action are in excess of $5,000,000 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2), (5). Plaintiff Reeves is a citizen of Colorado, Plaintiff O'Malley is a citizen of New York, and both currently reside in Washington, D.C. Defendant can be considered a citizen of Texas. Therefore, diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A).

13.     Venue in this district is proper pursuant to 28 U.S.C. §1391(b) because Defendant conducts business within, may be found in, and is subject to personal jurisdiction in this judicial district, and Plaintiff resides in and purchased the Products that are the subject of this action in this judicial district.

III.     **PARTIES**

14.     Plaintiff  S. J. Reeves ("Reeves") is an individual consumer over the age of eighteen. Reeves is a citizen of Colorado who currently resides in Washington D.C.  Reeves purchased the Products from 7-Eleven locations throughout Colorado, as well as in Washington D.C., Maryland and elsewhere.

15.     Plaintiff H. O'Malley ("O'Malley") is an individual consumer over the age of eighteen. O'Malley is a citizen of New York and currently resides in Washington D.C. O'Malley purchased the Products from a 7-Eleven located at 514 19th St. NW, Washington DC, 20052, as well as locations in Maryland, Virginia, and elsewhere.

16.     Plaintiffs seek injunctive relief and damages on behalf of themselves and the Class, and request a jury trial on damage claims.

17.     Defendant 7-Eleven, Inc. is a Texas corporation and lists its corporate headquarters in Dallas, Texas. Therefore, Defendant maybe considered a citizen of Texas. At all relevant times, Defendant marketed, distributed and sold various consumer Products, including the Products that are the subject of this lawsuit, to Plaintiffs and members of the class throughout this judicial district and the rest of the United States.

IV.     **FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

18.     The particulates that result from burning tobacco are collectively known as "tar." The tar is the element in cigarettes that contains various carcinogenic chemicals along with other

toxic chemicals, which, with repeated exposure, cause various cancers, including lung cancer.

19.     Nicotine, a dangerous drug, occurs naturally in the tobacco plant and is addictive. When a cigarette is smoked, the nicotine in the tobacco is carried on the tar into the lungs. From there, the nicotine gets absorbed into the bloodstream and arrives at the brain within about seven to ten seconds. In the brain or in the lungs, nicotine binds to nicotinic acetylcholine receptors, which triggers the release of various hormones, including dopamine, norepinephrine and acetylcholine. The release of these hormones causes the smoker to feel good, satisfies the craving for food, helps the smoker feel more alert and assists with arousal and cognitive function.

20.     Nicotine has long been known to be a dangerous and harmful chemical. Some of the many negative health effects of nicotine include lung, pancreatic, and breast cancer; respiratory problems; kidney disease; coronary artery disease; emphysema; gastroesophageal reflux disease (GERD); reproductive issues; macular degeneration (cataracts and vision loss); and addiction, which increases the likelihood of contracting the aforementioned afflictions.

21.     Repeated smoking of cigarettes with addictive levels of nicotine results in certain brain changes known as neuroplasticity, meaning new brain circuits or connections. These physiological changes from nicotine cause the smoker to feel withdrawal symptoms when the nicotine level in the brain drops below the level to which the smoker is accustomed. These symptoms include feelings of nervousness, edginess and anxiousness. The antidote to replenish the low level of nicotine in the brain is another cigarette.

22.     Menthol is an anesthetizing agent that, when added to the tobacco in a cigarette, numbs the sensory organs in the throat, making it easier to inhale the smoke more deeply, allowing more nicotine to be delivered to the body. By making cigarette smoke milder and easier to inhale, menthol makes it easier for young people to start to smoke.

23.    As a result, not only does smoking menthol cigarettes result in addiction, but also increased exposure to carcinogens, nicotine poisoning, and lung disease.

24.    In 2009, Congress passed—and President Obama signed into law—the Family Smoking Prevention and Tobacco Control Act, Pub. L. No. 111-31, 123 Stat. 1776 (codified, in relevant part, at 15 U.S.C. §§ 1333–34 and 21 U.S.C. § 301 *et seq*.) (2009) ("Tobacco Control Act").

25.    This Act authorized the U.S. Food & Drug Administration ("FDA") to regulate tobacco products, 21 U.S.C. § 387a, and prohibited all flavors in cigarettes, except for tobacco and menthol (i.e., the "flavor ban"), id. § 387g(a)(1). Although it did not ban menthol at that time, Congress recognized that menthol cigarettes "may pose unique health risks to those who smoke them."[2]

26.    Thereafter Congress repeatedly highlighted the urgent nature of the menthol inquiry, "urg[ing] the Secretary [of the U.S. Department of Health and Human Services ("HHS")] to address these issues *as quickly as practicable*." H. Rept., Part 1 at 38 (emphasis added). Indeed, Congress believed that it would be "*critical* for the Secretary *to move quickly* to address the unique public health issues posed by menthol cigarettes." *Id*. at 38–39 (emphasis added).

27.    In 2010, FDA organized a Tobacco Product Scientific Advisory Committee ("TPSAC") in accordance with the Act's directive. That Committee was comprised of "a panel of leading public health, scientific experts and representatives of various parts of the tobacco industry." *See* FDA, Dr. Lawrence R. Deyton, Dir. Center for Tobacco Products, *FDA Remarks on the Report and Recommendation on the Public Health Impact of Menthol Cigarettes* (Mar. 18, 2011) ("2011

---

[2] H. Rept. 111-58, Part 1, Tobacco Control Act, 111th Congress (2009–10), 38 (Energy and Commerce Comm.) ("H. Rept., Part 1"). *Available at* https://www.congress.gov/111/crpt/hrpt58/CRPT-111hrpt58-pt1.pdf .

FDA Remarks on Menthol Cigarettes Rept.").[3]

28.     This Committee was charged with "providing advice, information, and recommendations to FDA on health issues related to tobacco products and other issues relating to the regulation of tobacco products." *Id*.

29.     The full Scientific Advisory Committee first met in March 2010, and 11 more times thereafter. *See* FDA Rept. to Congress, *Progress and Effectiveness of the Implementation of the Family Smoking Prevention and Tobacco Control Act*, at 15 (2013). There were also two meetings of the Tobacco Products Constituents Subcommittee of the TPSAC and two meetings of the Menthol Report Subcommittee. *See id*.

30.     On March 23, 2011, the TPSAC submitted its report, *Menthol Cigarettes and Public Health: Review of the Scientific Evidence and Recommendations* (2011) ("2011 TPSAC Menthol Rept."). This Report—also known as the TPSAC Report—contained a number of findings and conclusions, based on the best available scientific evidence.

31.     Among other things, the Report found that menthol is a flavor additive that possesses a minty taste and aroma. *See* 2011 TPSAC Menthol Rept. at 16. In certain medicinal products such as cough drops, menthol is actually regulated as a drug. *See id*. The use of menthol in tobacco products, however, was not. *See id*.

32.     The Report also found that menthol produces a variety of sensory effects, including cooling and soothing effects, as well as anesthetic effects. *See id*. at 23. For example, "[i]n cigarettes with low levels of tar and nicotine, the addition of menthol can enhance the 'bite' or 'throat grab' of the smoke, making such cigarettes more acceptable to consumers. Conversely, the

---

[3] Available at
https://wayback.archiveit.org/7993/20170112125250/http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/TobaccoProductsScientificAdvisoryCommittee/ucm247617.htm.

addition of menthol to cigarettes high in tar and nicotine can reduce the irritating effect of nicotine ... making these cigarettes more palatable." *Id*. at 24.

33.    Additionally, the Report found that the tobacco companies "manipulated the concentration of menthol to achieve a desired taste, aroma, and cooling sensation based on anticipated consumer preference and demand." *See id.* at 55.

34.    The Report also concluded that menthol cigarettes were associated with "increased transition to greater or established smoking and dependence." *Id.* at 149.

35.    In sum, the Report noted that sufficient evidence existed to conclude that the availability of menthol cigarettes— increases experimentation and regular smoking, *id*. at 216; increases the likelihood of addiction and the degree of addiction in youth smokers, *id*. at 216; and results in lower likelihood of smoking cessation success in African-Americans, compared to smoking non-menthol cigarettes, *id*. at 217.

36.    The availability of menthol cigarettes was also found to "increase the likelihood of experimentation and regular smoking beyond the anticipated prevalence if such cigarettes were not available, in the general population and particularly in African Americans." *Id.* at 219. In addition, the Committee found a "causal relationship between the availability of menthol cigarettes and regular smoking among youth." *Id*. It also found that menthol cigarette marketing increased the prevalence of smoking "beyond anticipated prevalence if such cigarettes were not available for the whole population, and for youth and African Americans." *Id*. at 220.

37.    Based on the Committee's findings, the Report made two overall conclusions: (1) "Menthol cigarettes have an adverse impact on public health in the United States"; and (2) "There are no public health benefits of menthol compared to non-menthol cigarettes." 2011 TPSAC Menthol Rept. at 220. As explained by the Committee, "the availability of menthol cigarettes has

led to an increase in the number of smokers and this increase does have adverse public health impact in the United States." *Id.* at 220.

38.    "[O]f particular concern was the high rate of menthol cigarette smoking among youth and the trend over the last decade of increasing menthol cigarette smoking among 12–17 year-olds, even as smoking of non-menthol cigarettes declines. .... Thus, the availability of menthol cigarettes increases initiation and reduces cessation, thereby increasing the number of people who are smoking. This increase in the number of smokers represents an adverse impact of the availability of menthol cigarettes on public health." *Id.* at 220–21.

39.    In testament to the disproportionately toxic effects of menthol cigarettes, the Committee's Report posited that if menthol cigarettes had been removed from the marketplace in 2010, then (a) by 2020, roughly 17,000 premature deaths would have been avoided, and about 2.3 million people would not have started smoking; and (b) by 2050, the cumulative gains would have resulted in over 327,000 premature deaths avoided, and over 9.1 million people that would not have started smoking.

40.    Aa result of the Committee's findings, the Committee then made the following overall recommendation to FDA: **"Removal of menthol cigarettes from the marketplace would benefit public health in the United States."** 2011 TPSAC Menthol Rept. at 225 (emphasis in original).  Per the Committee:

> Menthol cigarettes are now smoked by most African American smokers and there is a concerning rise of menthol cigarette smoking among youth. Menthol cannot be considered merely a flavoring additive to tobacco. Its pharmacological actions reduce the harshness of smoke and the irritation from nicotine, and may increase the likelihood of nicotine addiction in adolescents and young adults who experiment with smoking. Furthermore, the distinct sensory characteristics of menthol may enhance the addictiveness of menthol cigarettes, which appears to be the case

among youth. [The Committee] has found that the availability of menthol cigarettes has an adverse impact on public health by increasing the numbers of smokers with resulting premature death and avoidable morbidity. *Id.* at 225.

41.    The FDA subsequently conducted a peer-reviewed investigation in 2013. *See* FDA Rept. to Congress, *Progress and Effectiveness of the Implementation of the Family Smoking Prevention and Tobacco Control Act*, at 15 (2013).[4]

42.    Based on its review, the FDA found that the weight of evidence supported the following similar conclusions:

    a.    Menthol in cigarettes is "likely associated with altered physiological responses to tobacco smoke";

    b.    A majority of African American smokers use menthol cigarettes;

    c.    Younger populations have the highest rate of smoking menthol cigarettes;

    d.    Female smokers are more likely to smoke menthol cigarettes than male smokers;

    e.    The marketing of menthol cigarettes is associated with menthol brand preference among adolescents and the African American community;[5] and

    f.    Menthol in cigarettes is likely associated with:

---

[4] *Available at* https://www.fda.gov/media/86670/download.

[5] "The available data show that advertising is a strong driver of brand preference among adolescents and that it is likely that the standard marketing mix approach of price, promotion, product, and place has been used to drive menthol cigarette preference among the urban African American community." 2013 FDA Findings, at 5.

i. increased initiation and progression to regular cigarette smoking;[6]

   ii. increased dependence;[7] and

   iii. reduced success in smoking cessation, especially among African American menthol smokers.[8]  2013 FDA findings at 4-6.

43. The FDA ultimately concluded that menthol in cigarettes was associated with greater addiction, menthol smokers were less likely to successfully quit smoking, and that menthol cigarettes likely posed "a public health risk above that seen with nonmenthol cigarettes":

> The impact of cigarette smoking upon public health is indisputable. More than 400,000 deaths per year in the United States are caused by tobacco use. Consistent patterns have emerged as a result of FDA's evaluation of the scientific evidence relevant to the impact of menthol tobacco products on public health. ... [A]dequate data suggest that menthol use is likely associated with increased smoking initiation by youth and young adults.

> Further, the data indicate that menthol in cigarettes is likely associated with greater addiction. Menthol smokers show greater signs of nicotine dependence and are less likely to successfully quit smoking. These findings, combined with the evidence indicating that menthol's cooling and anesthetic properties can reduce the harshness of cigarette smoke and the evidence indicating that menthol cigarettes are marketed as a smoother alternative to nonmenthol cigarettes, make it likely that menthol cigarettes pose a public health risk above that seen with nonmenthol cigarettes.

---

[6] "Data show that newer smokers prefer menthol at levels substantially above that of the general population, with an inverse correlation between age and menthol preference that reaches a plateau in adulthood." 2013 FDA Findings, at 5.

[7] "There were consistent findings that menthol smokers more likely to smoke their first cigarette within five minutes of waking." 2013 FDA Findings, at 6.

[8] "In the reviewed studies, menthol smokers, especially African American menthol smokers, were less likely to successfully stop smoking than their nonmenthol smoking counterparts. This is consistent with the observation that menthol smokers appear to be more nicotine dependent than nonmenthol smokers which can be an important factor in smoking cessation success." 2013 FDA Findings, at 6.

*Id.* at 6.

44.    Additional studies have since similarly concluded that removing menthol from cigarettes is likely to reduce youth smoking initiation, improve smoking cessation outcomes in adult smokers, and in turn, benefit public health.[9]

45.    For example, a follow up study reviewing Canada's menthol ban found higher rates of quitting among daily and occasional menthol smokers, one year after the implementation of a menthol ban.[10]

46.    Many other countries have also recognized the disproportionately harmful effects of menthol cigarettes and have since begun to ban them.[11]

47.    The COVID-19 pandemic has further showcased the myriad ways in which menthol cigarettes negatively impact the public health, and the African-American community in particular.

48.    A study in the New England Journal of Medicine found that coronavirus patients in China who smoked were more than twice as likely as those who didn't to have severe infections from COVID-19.[12]

49.    An April 8, 2020, advisory from Massachusetts Attorney General Maura Healey

---

[9] Andrea C. Villanti, et al., *Menthol Cigarettes and The Public Health Standard: A Systematic Review*, BMC Public Health (Dec. 29, 2017). *Available at* https://bmcpublichealth.biomedcentral.com/articles/10.1186/s12889-017-4987-z.

[10] *See* Chaiton M.O. et al., *Ban on menthol-flavoured tobacco products predicts cigarette cessation at 1 year: a population cohort study*, Tobacco Control (May 30, 2019). *Available at* https://tobaccocontrol.bmj.com/content/early/2019/05/29/tobaccocontrol-2018-054841.

[11] For example, in 2012, Brazil approved a ban on all flavors, including menthol, in all tobacco products. In 2016, the European Union banned all flavored cigarettes including menthol (effective 2020). And in 2017, Canada banned the sale of menthol cigarettes. *See* Campaign for Tobacco-Free Kids, Brazil's Highest Court Upholds Ban on Flavored Tobacco Products (Feb. 1, 2018). *Available at* https://www.tobaccofreekids.org/press-releases/2018_02_01_brazil-court-upholds-flavor-ban (last visited June 13, 2020). World Health Organization, Advisory Note: Banning Menthol in Tobacco Products, 49–50 *available at* https://apps.who.int/iris/bitstream/handle/10665/205928/9789241510332_eng.pdf;jsessionid.

[12] *Available at* https://www.nytimes.com/2020/04/09/health/coronavirus-smoking-vaping-risks.html (citing https://www.nejm.org/doi/full/10.1056/NEJMoa2002032).

warned that "it is vital that people are aware of the serious potential risks associated with smoking or vaping and COVID-19," noting that "flavored tobacco products could make lung infections like COVID-19 worse."[13]

50.     In response, the FDA has re-committed to its efforts to ban menthol cigarettes in order to reduce addiction and save lives.[14]

51.     In April 2022, the FDA announced its "long-awaited plan to ban menthol cigarettes and flavored cigars, citing the toll on Black smokers and young people."[15]

52.     According to Health and Human Services Secretary Xavier Becerra, the proposed regulations "would help prevent children from becoming the next generation of smokers and help adult smokers quit" and were an "important step to advance health equity" by reducing racial disparities in tobacco use.

53.     In its proposed rule, the FDA found that: "Evidence from tobacco industry documents indicates that the industry has been adding menthol to cigarettes because of perceptions

---

[13] *Available at* https://www.mass.gov/doc/covid-vaping-advisory/download.

[14] *Available at https://www.fda.gov/news-events/press-announcements/fda-commits-evidence-based-actions-aimed-saving-lives-and-preventing-future-generations-smokers*. *See also* "FDA Commits to Evidence Based Actions Aimed at Saving Lives and Preventing Future Generations of Smokers." (April 29, 2021). *Available at* https://www.fda.gov/news-events/press-announcements/fda-commits-evidence-based-actions-aimed-saving-lives-and-preventing-future-generations-smokers ("Banning menthol—the last allowable flavor—in cigarettes and banning all flavors in cigars will help save lives, particularly among those disproportionately affected by these deadly products. With these actions, the FDA will help significantly reduce youth initiation, increase the chances of smoking cessation among current smokers, and address health disparities experienced by communities of color, low-income populations, and LGBTQ+ individuals, all of whom are far more likely to use these tobacco products," said Acting FDA Commissioner Janet Woodcock, M.D. "Together, these actions represent powerful, science-based approaches that will have an extraordinary public health impact. Armed with strong scientific evidence, and with full support from the Administration, we believe these actions will launch us on a trajectory toward ending tobacco-related disease and death in the U.S.").

[15] Matthew Perrone, FDA Issues Plan to Ban Menthol Cigarettes, Associated Press, Apr. 28, 2022. *Available at* https://www.nbcmiami.com/news/health/fda-to-announce-plan-banning-menthol-cigarettes/2747709/.

among new users that menthol cigarettes are less harsh and easier to smoke (Ref. 7). These documents indicate that menthol has traditionally been added to cigarettes as a design feature to attract new youth and young adult smokers (Refs. 7 and 6)."[16]

54.     Additionally, "[c]linical and animal studies show that menthol enhances brain nicotinic receptor levels to a greater extent than nicotine alone (Refs. 14, 10, and 11). These changes occur in brain regions involved in the development of nicotine addiction (Refs.10-12). Therefore, menthol's ability to enhance the effects of nicotine in the brain contributes to why menthol smokers have greater difficulty quitting smoking compared to non-menthol smokers."[17]

55.     Phillip Gardiner of the African American Tobacco Control Leadership Council expressed these sentiments, stating that "Black folks die disproportionately of heart disease, lung cancer and stroke," and "[M]enthol cigarettes [] are the main vectors of those diseases in the Black and brown communities."

56.     Plaintiff Reeves purchased the menthol Products, including but not limited to Newport and Kool menthol cigarettes, from various 7-Eleven locations at numerous times within the past 12 months, including 7-Eleven locations in Aspen and Denver, Colorado as recently as August 2022.

57.     Plaintiff O'Malley purchased the menthol Products, including but not limited to Newport and Kool menthol cigarettes, from a 7-Eleven at 514 19th St. NW, Washington, DC 20052, as well as other 7-Eleven locations in New York, Maryland and Virginia during the past 12 months.

58.     Defendant 7-Eleven knew or should have known of the deceptiveness of the

---

[16] See https://www.federalregister.gov/d/2022-08994/p-137
[17] https://www.federalregister.gov/d/2022-08994/p-166

Products' marketing, yet it elected to continue to market, advertise and sell the Products to consumers. Despite having this knowledge of the deceptively labeled Products, 7-Eleven has sold thousands, if not millions of units of the Products, including to Plaintiffs, thereby selling customers a Product that 7-Eleven knew was deceptively packaged and labeled, which was much more harmful and addictive than 7-Eleven represented to consumers.

59.     In purchasing the Products from local 7-Eleven stores, Plaintiffs believed that the Products were simply ordinary cigarettes when in fact the Products pose a far greater health risk than any other type of cigarette. By placing the Products next to normal cigarettes, Defendant misrepresented the harmful nature of the Products, leading Plaintiffs to believe the Products were no more hazardous than ordinary cigarettes.

60.     Defendant failed to disclose the inordinately addictive and harmful nature of the Products compared to other cigarettes, and Defendant's advertising and marketing is deceptive and likely to mislead the public as a result.

61.     Plaintiffs and Class Members would not have purchased the Products if they had known the true nature of their harmful effects.

62.     In purchasing the Products, Plaintiff observed the marketing, product placement and advertising for the Products misrepresenting them as typical cigarettes no more dangerous than any other. In purchasing the Products in the District of Columbia, Colorado, New York and elsewhere, Plaintiffs saw marketing, product placement and advertising like that depicted in Exhibit 1.

63.     Plaintiffs and Class Members have been damaged by their purchase of the Products because the marketing and the advertising for the Products was and is deceptive and misleading; therefore, the Products are worth less than what Plaintiffs paid for them, and Plaintiffs and Class

Members did not receive what they reasonably intended to receive.

64. Defendant failed to disclose that the Products are unreasonably dangerous and excessively addictive, which was important to Plaintiffs and Class Members in deciding to purchase and use the Products because they would not have purchased the Products had they been advertised or marketed in a manner disclosing their significant and disproportionate health risks to consumers.

65. At a minimum, Plaintiffs and Class Members contend that Defendant should at the very least disclose that the Products pose a public health risk above that seen with nonmenthol cigarettes.

## V. CLASS ALLEGATIONS

66. Plaintiffs re-allege and incorporate by reference all allegations set forth above.

67. Plaintiffs brings this class action pursuant Federal Rule of Civil Procedure 23 and seeks certification of the claims and certain issues in this action pursuant to the applicable provisions of Federal Rule of Civil Procedure 23 on behalf of the following individuals:

> All United States residents who purchased menthol cigarettes (the "Products") from 7-Eleven, Inc. ("Defendant") in the United States from the four years preceding the filing of this complaint to present ("Class Period").

68. Excluded from the Class are Defendant and any officer, director, employee, legal counsel, firm, trust, corporation, or other entity related to or affiliated with Defendant and the members of the judiciary and their office staff to whom this case may be assigned.

69. Plaintiffs reserve the right to propose appropriate subclasses or issue classes at the time the Motion for Class certification is filed. All such subclasses or issue classes will be based on the allegations of this Class Action Complaint and will include only members or issues or both

members and issues that are subparts of the class definition proposed above and of the causes of action pleaded in this Class Action Complaint.

70.     Defendant's practices and omissions were applied uniformly to all Members of the Class, so that the questions of law and fact are common to all Members of the Class. All Members of the Class were and are similarly affected by having purchased and used the menthol cigarettes, which they would not have done had Defendant properly warned Class Members that the Products are far more harmful and addictive than any other type of cigarette available to consumers, and the relief sought herein is for the benefit of Plaintiffs and members of the putative Class.

71.     On information and belief, Plaintiffs allege that the proposed class is so numerous that joinder of all members would be impractical. Based on the annual sales of the Products and the popularity of the Products, it is apparent that the number of consumers of the Products would at least be in the many thousands, thereby making joinder impossible.

72.     Questions of law and fact common to the Plaintiffs and the Class exist that predominate over questions affecting only individual members, including, *inter alia*:

> a.   Whether Defendant's practices in connection with the design, testing, manufacture, assembly, development, promotion, marketing, advertising and sale of the Products were deceptive;
>
> *b.*  Whether Defendant's practices in connection with the design, testing, manufacture, assembly, development, promotion, marketing, advertising and sale of the Products were deceptive or unfair in any respect, thereby violating the D.C. Consumer Protection Procedures Act ("CPPA"), *inter alia*, D.C. Code. § 28-3901, *et seq;*
>
> c.   Whether the Products contain menthol;

d.  Whether Defendant failed to disclose that the Products pose a public health risk above that seen with nonmenthol cigarettes;

e.  Whether Defendant negligently misrepresented the true nature of the Products;

f.  Whether Defendant breached implied warranties in its sale of the Products, thereby causing harm to Plaintiff and Class Members; and

g.  Whether Defendant's conduct as set forth above injured consumers and if so, the extent of the injury.

73.  The claims asserted by Plaintiffs in this action are typical of the claims of the members of the Plaintiff Class, as the claims arise from the same course of conduct by Defendant, and the relief sought is common.

74.  Plaintiffs will fairly and adequately represent and protect the interests of the members of the Plaintiff Class. Plaintiffs have retained counsel competent and experienced in both consumer protection and class action litigation.

75.  Certification of this class action is appropriate under Federal Rule of Civil Procedure 23 because the questions of law or fact common to the respective Members of the Class predominate over questions of law or fact affecting only individual members.

76.  This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims.

77.  Absent a class action, it would be highly unlikely that the representative Plaintiffs or any other Members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed the expected recovery.

78. Certification is also appropriate because Defendant acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

79. Further, given the large number of Class Members, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.

80. A class action is a fair and appropriate method for the adjudication of the controversy, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that such individual actions would engender.

81. The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of this class action.

## FIRST CAUSE OF ACTION

### VIOLATION OF THE DISTRICT OF COLUMBIA'S CONSUMER PROTECTION PROCEDURES ACT ("CPPA"), SECTION 28-3901, *ET SEQ.*

82. Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 – 81 above.

83. This cause of action is brought pursuant the District of Columbia's Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901, *et seq.* The purpose of the Act is to protect the consuming public and "assure that a just mechanism exists to remedy all improper trade practices and deter the continuing use of such practices," and to "promote, through effective

enforcement, fair business practices throughout the community." See D.C. Code §28-3901(b).

84. The sale of the Products at issue were consumer transactions within the scope of the CPPA.

85. Plaintiffs are each a "consumer" as defined by D.C. Code §28-3901(a)(2). The Products are a "good" within the meaning of the Act. Defendant is engaged in trade or commerce within the meaning of the Act.

86. Section 28-3904 of the Act declares as unlawful to (a) represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have …. (d) represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another … (e) misrepresent as to a material fact which has a tendency to mislead, among other acts … (f) fail to state a material fact if such failure tends to mislead, and (f-1) [u]se innuendo or ambiguity as to a material fact, which has a tendency to mislead. Defendant has violated each one of these subsections of Section 28-3904.

87. Section 28-3901(d) states: "In construing the term "unfair or deceptive trade practice" due consideration and weight shall be given to the interpretation by the Federal Trade Commission and the federal courts of the term "unfair or deceptive act or practice," as employed in section 5(a) of An Act To create a Federal Trade Commission, to define its powers and duties, and for other purposes, approved September 26, 1914." Defendants' unfair and deceptive practices are likely to mislead – and have misled – the consumer acting reasonably under the circumstances and, therefore, violate the FTC's prohibition of false and deceptive advertising of tobacco products.

88. Under the CPPA, the placement of a product can be a "representation" within the meaning of the CPPA.

89.     Defendant has violated the Act by engaging in the unfair and deceptive practices described above, which offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers. Specifically, Defendant has represented the Products as ordinary cigarettes and failed to disclose that the Products are in fact much more harmful and addictive than the other nonmenthol cigarettes available to consumers.

90.     Furthermore, as explained in detail above, Defendant had knowledge of the Products misrepresentations since at least 2013 when the FDA concluded that menthol cigarettes were associated with greater addiction and posed a public health risk above that seen with nonmenthol cigarettes.

91.     Plaintiffs and Class Members have been aggrieved by Defendant's unfair and deceptive practices in that they purchased and used Defendant's Products.

92.     A reasonable consumer relies on retailers to be truthful in their marketing. In fact, 7-Eleven recognizes its duty to be responsible and prides itself on setting the standard for responsible retailing in the convenience industry:

> To lead, we serve. 7-Eleven has always been about serving the needs of others – which is why customer-obsession and servant leadership is at the core of everything we do. We live by our Values and Leadership Principles so we can best serve our customers, our stores, our Franchisees, and our communities – every single day.
>
> https://corp.7-eleven.com/corp/about (last visited November 4, 2022).

93.     As described in detail above, Defendant has represented its Products as products as safer or comparable alternatives to cigarettes and omitted material information known to Defendant, namely that the Products are more potent and addictive than other types of cigarettes.

94.     Defendant also misrepresented the harmful nature of the Products, by placing them next to ordinary cigarettes, despite the fact that menthol cigarettes are a more harmful product.

95. Defendant has deceived reasonable consumers, like Plaintiffs and the Class, into believing its Products was something it was not—a safer alternative to cigarettes or at the very least no more harmful than any other.

96. The Reasonable Consumer necessarily relies on commercial retail companies to honestly represent the true nature of their products.

97. As described in detail above, Defendant has represented its menthol cigarettes as typical cigarettes and failed to disclose that the Products in fact pose greater health risks to consumers than any other type of cigarette.

98. Defendant has deceived reasonable consumers, like Plaintiffs and the Class, into believing its Products were something they were not—standard cigarettes no more harmful than any other.

99. The knowledge required to discern the true nature of Defendant's Products is beyond that of the reasonable consumer—namely that the Products pose a public health risk above that seen with nonmenthol cigarettes.

100. The damages suffered by the Plaintiffs and the Class were directly and proximately caused by the deceptive, misleading and unfair practices of Defendant, as described above.

101. Pursuant to D.C. Code § 28-3905, Plaintiffs and the Class seek a declaratory judgment and court order enjoining the above described wrongful acts and practices of the Defendant and for restitution and disgorgement.

102. Additionally, pursuant to sections D.C. Code § 28-3905(2)(A) and (B), Plaintiffs and the Class make claims for treble damages, attorney's fees and costs.

## SECOND CAUSE OF ACTION

## <u>NEGLIGENT MISREPRESENTATION</u>

103. Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 – 81 above.

104. Defendant has negligently misrepresented the Products as conventional cigarettes no different than any others when in fact, they are not because they are far more addictive and harmful than the other types of cigarettes available to consumers.

105. Defendant has omitted a material fact to the public, including Plaintiffs and Class Members, about its Products. Through advertising not related to the label, Defendant has failed to disclose the material fact that the Products pose a public health risk above that seen with nonmenthol cigarettes.

106. Defendant knew or should have known that the representations were false and that said omissions would materially affect Plaintiffs' and Class Members' decisions to purchase the Products.

107. Plaintiffs and other reasonable consumers, including the Class Members, reasonably relied on Defendant's representations set forth herein, and, in reliance thereon, purchased the Products.

108. The reliance by Plaintiffs and Class Members was reasonable and justified in that Defendant appeared to be, and represented itself to be, a reputable business.

109. Plaintiffs and Class Members would not have been willing to pay for Defendant's Products if they knew the Products were more harmful and addictive than the other nonmenthol cigarettes available for purchase.

110. As a direct and proximate result of these misrepresentations, Plaintiffs and Class Members were induced to purchase and use Defendant's Products, and have suffered damages to be determined at trial in that, among other things, they have been deprived of the benefit of their

bargain in that they bought Products that were not what they were represented to be, and have spent money on Products that had less value than the price they paid for the Products.

111.    Plaintiffs and Class Members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### THIRD CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY
### OF MERCHANTABILITY

112.    Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 – 81 above.

113.    Defendant has represented through selective marketing statements that omit material information that the Products are mere ordinary cigarettes; therefore, Defendant impliedly warranted that the Products are no more harmful than any other and are fit for ordinary use.  The Products, however, are not fit for ordinary use because they are much more dangerous and addictive than any of their nonmenthol analogs.

114.    Plaintiff and other Members of the Class sought to purchase typical cigarettes. In doing so, Plaintiff and other Members of the Class relied on Defendant's skill and judgment to select and furnish suitable goods for that purpose, and on or about that time, Defendant sold the Products to Plaintiff and other Members of the Class.

115.    By its representations regarding the reputable nature of its company, and by its promotion and marketing of the Products, Defendant warranted that the Products were conventional and suitable for use and consumption by consumers. Plaintiff and Members of the Class bought the Products from Defendant, relying on Defendant's skill and judgment.

116.    However, Defendant's Products were not reasonably fit for consumption because they pose an unreasonable public health risk above that seen with nonmenthol cigarettes. Therefore,

the goods were not reasonably fit for the purposes intended.

117.    At the time of sale, Defendant had reason to know the particular purpose for which the goods were required, and that Plaintiff and Members of the Class were relying on Defendant's skill and judgment to select and furnish typical cigarettes, so that there was an implied warranty that the goods (the Products) were fit for this purpose.

118.    However, Defendant breached the warranty implied at the time of sale because Plaintiff and Members of the Class did not receive suitable goods in as much as the goods were far more harmful and addictive than any of the other cigarettes available to consumers.

119.    Because the Products pose a public health risk above that seen with nonmenthol cigarettes, the Products were not fit for the particular purpose for which they were marketed.

120.    As a proximate result of this breach of warranty by Defendant, Plaintiff and Members of the Class have suffered actual damages in an amount to be determined at trial in that they were induced to purchase a Products they would not have purchased had they known the true facts about and have spent money on Products that were not what they were represented to be, and that lack the value Defendant represented the Products to have.

121.    Furthermore, Defendant continues to market the Products without disclosing that the Products pose a public health risk above that seen with nonmenthol cigarettes, which information a reasonable consumer would find material to their purchasing decision.

## FOURTH CAUSE OF ACTION

## BREACH OF IMPLIED WARRANTY
## OF FITNESS FOR PURPOSE

122.    Plaintiff re-alleges and incorporates by reference verbatim the allegations set forth in paragraphs 1 – 81 above.

123.    Defendant has represented that the Products are ordinary cigarettes when in fact, the Products pose a public health risk above that seen with nonmenthol cigarettes. Therefore, Defendant impliedly warranted that the Products are standard cigarettes no more harmful than any other and fit for ordinary use.

124.    Plaintiff and other Members of the Class sought typical cigarettes. In doing so, Plaintiff and other Members of the Class relied on Defendant's skill and judgment to select and furnish suitable goods for that purpose, and on or about that time, Defendants sold the Products to Plaintiff and other Members of the Class.

125.    By their representations regarding the reputable nature of its company and related entities, and by their promotion and marketing of their Products, Defendant warranted that the Products were ordinary cigarettes fit for use by consumers. Plaintiff and Members of the Class bought the Products from Defendant, relying on Defendant's skill and judgment.

126.    However, Defendant's Products were not safe and conventional products because they are far more addictive and harmful as set forth in detail above. Therefore, the Products were not reasonably fit for the purposes intended.

127.    At the time of sale, Defendant had reason to know the particular purpose for which the goods were required, and that Plaintiff and Members of the Class were relying on Defendant's skill and judgment to select and furnish conventional goods, so that there was an implied warranty that the goods (the Products) were fit for this purpose.

128.    However, Defendant breached the warranty implied at the time of sale because Plaintiff and Members of the Class did not receive suitable goods in as much as the goods pose a public health risk above that seen with nonmenthol cigarettes.

129.    Because the Products pose a public health risk above that seen with nonmenthol

cigarettes, the Products were not fit for the particular purpose for which they were marketed.

130. As a proximate result of this breach of warranty by Defendant, Plaintiff and Members of the Class have suffered actual damages in an amount to be determined at trial in that they were induced to purchase products they would not have purchased had they known the true facts about and have spent money on products that were not what they were represented to be, and that lack the value Defendant represented the Products to have.

131. Furthermore, Defendant continues to market the Products without disclosing that the Products pose a public health risk above that seen with nonmenthol cigarettes, which is a fact objectively reasonable consumers would find material to their purchasing decision.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief, jointly and severally pursuant to each cause of action set forth in this Complaint as follows:

1. For an order certifying that the action may be maintained as a class action, including potential subclasses, issue classes, and subclass issue classes and Plaintiffs' counsel be appointed as Class Counsel and Plaintiffs be appointed as class representatives;

2. For an award of equitable relief as follows:

   a. Enjoining Defendant from continuing to engage, use, or employ any unfair and/or deceptive business acts or practices, including, without limitation, omission of information to the purchasing decision of an objectively reasonable consumer, related to the marketing and advertising of the Products for the purpose of selling the Products in such manner as set forth

in detail above;

    b.   Restoring all monies that may have been acquired by Defendant as a result of such unfair and/or deceptive act or practices; and

    c.   Requiring Defendant to disgorge all ill-gotten gains flowing from the conduct described herein.

3.   For actual damages in an amount to be determined at trial;

4.   For an award of attorneys' fees and costs;

5.   For pre- and post-judgment interest on any amounts awarded; and

6.   For any other award the Court might deem just, appropriate, or proper.

## DEMAND FOR JURY TRIAL

Plaintiff demand a jury trial on all issues so triable.

Dated this 17th day of November, 2022:

> _By: /s/ Howard W. Rubinstein_
> Howard W. Rubinstein, Esq.
> D.C. Bar No: TX23253
> The Law Office of Howard W. Rubinstein
> 625 E. Maine, Suite 102
> Aspen, CO 81611
> Telephone: 832-715-2788
> Email: howardr@pdq.net



Photograph taken on November 7, 2022 at the 7-Eleven location on Garth Road in Baytown, Texas.



EXHIBIT
1



Photograph taken on November 7, 2022 at the 7-Eleven location on Highway 146 in Baytown, Texas



Photograph taken on November 7, 2022 at the 7-Eleven location on Highway 146 in Baytown, Texas